UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 06-21124-CIV-MARRA/JOHNSON

DAVID LIPPMAN,

      Plaintiff,

vs.

THE CITY OF MIAMI et al.,

      Defendants.

_____/

**OPINION AND ORDER**

This cause is before the Court upon the Individual Federal Defendants' Motion to

Dismiss or in the Alternative for Summary Judgment (DE 135); Broward Sheriff's Office

Defendants' Motion for Summary Judgment on Counts IV, V, and VIII of Plaintiff's Second

Amended Complaint[1] (DE 146); Defendant Rafael Masferrer's Motion for Summary Judgment

on Count VII of Plaintiff's Second Amended Complaint (DE 189); Defendant City of Miami's

Motion for Summary Judgment on Counts I, II, III of Plaintiff's Second Amended Complaint

(DE 190); Plaintiff's Post-Hearing Motion to Lift Stay of Discovery for Specific Purposes (DE

219) and Plaintiff's Motion for Case Management Conference (DE 262).

I. Background

_____The facts, as culled from affidavits, exhibits, answers, answers to interrogatories and

reasonably inferred therefrom in the light most favorable for the plaintiff, for the purpose of this

motion, are as follows:

_____

[1] Plaintiff filed a Third Amended Complaint after the filing of these summary judgment
motions.  Defendants filed a Notice of Adoption of Summary Judgment Arguments made in
response to the Second Amended Complaint (DE 234 and 237).

_____The Free Trade Area of the Americas (FTAA) summit was an international trade conference held in November of 2003 involving 34 nations from North America, Central America, South America and the Caribbean.  Prior trade conferences in other cities had led to mass demonstrations, civil disobedience and widespread violence**.**[2] (Brooks Aff. ¶ 2; Third Am. Compl. ("TAC") ¶ 1.)  During the weeks and months leading up to the FTAA summit, the City of Miami and the Miami Police Department ("MPD") undertook the planning of law enforcement operations for the time period of the FTAA event.  (TAC ¶ 21.)  The FTAA was a major public safety and security concern for law enforcement agencies, governmental agencies, businesses and citizens of Miami.  During the event, roads and businesses were closed in anticipation of crowds of demonstrators and the risk of violence.  Dozens of law enforcement agencies entered into a mutual aid agreement with the City of Miami for the purpose of providing additional law enforcement personnel to maintain public order and safety.  The safety concerns and heightened security measures were due to the fact that thousands of demonstrators were anticipated, and demonstrations at similar events in other cities had led to violence, public disturbances, including injury to law enforcement officers, as well as damage to property and lost income. (Frank Cornetta Aff. ¶ 3; Miami Deputy Chief of Police Frank Fernandez Aff. ¶ ¶ 8-9; Miami Sergeant Rafael Masferrer Aff. ¶ 3 .)  The MPD's research indicated that 101 officers were injured by protestors during the FTAA 2001 summit in Quebec. (Fernandez Aff. ¶ 9.) Based on its own research, the MPD believed that protestors were being trained to counter and circumvent law enforcement efforts and that some protestors were using violence to achieve their

_____

[2] Plaintiff challenges this statement as having no foundation because of lack of personal knowledge as to what occurred "in other cities." (DE 151 at ¶ 6.)

objectives. (Fernandez Aff. ¶¶ 8, 10.)

The City of Miami took substantial steps to anticipate, plan for, and avoid violence and terrorist activity.  Approximately 35 municipal, state, and federal law enforcement agencies, including the Broward Sheriff's Office ("BSO"), the Federal Bureau of Investigation ("FBI"), and the United States Department of Homeland Security, participated in a joint law enforcement operation designed to ensure the security and safety of the summit participants, citizens, visitors, and businesses in the area, and to maintain order during anticipated demonstrations.  The 2003 FTAA event was the largest joint law enforcement effort in Florida history. (Brooks Aff. ¶ 3.)

As part of the planning leading up to the FTAA demonstrations, the MPD recruited federal, state, county and municipal police departments from throughout south Florida to be part of a security force.  Ultimately, the MPD assembled a multi-agency police/security force in which nearly forty different law enforcement agencies participated.  Some of the participating agencies, including the BSO, signed a "mutual aid agreement" with the City of Miami, which allowed the signatory department to exercise police powers outside its own jurisdiction and within the City of Miami.   (Mutual Aid Agreement, Ex. A to Second Am. Compl.; TAC. ¶¶ 22-23; Masferrer Aff. ¶ 3.)  During the FTAA summit, the MPD assumed a leadership role with regard to law enforcement activities.  (TAC ¶ 24.)

On November 19, 2003, Plaintiff David Lippman arrived in Miami and parked his 1991 Nissan pickup truck in parking garage number three at 190 Northeast Third Street. (TAC ¶ 32.) Garage number three was a potential bomb target due to its function and location. It serves as an official parking location for the College/Bayside Metromover station, which is a busy transfer station between the Omni, Downtown and Brickell loops.  The third floor of the garage was also

an official parking location for police vehicles and the FTAA event was located very close to the garage. (Masferrer Aff. ¶ 13.)

Facts relating to Defendants Frank Cornetta and John Melbourne

At the FTAA event, Detective John Melbourne and his supervisor, Sergeant Frank Cornetta, both experienced officers and members of the BSO Bomb Squad Team Number 13, were assigned to work in Miami-Dade County to assist the City of Miami and the FBI. (Cornetta Aff. ¶¶ 2, 4.) Cornetta, a Certified Bomb Technician, served on the Bomb Squad for 24 years, and served in a supervisory capacity for 11 years. Melbourne had been a Certified Police Hazardous Devices Technician since 1998. (Cornetta Aff. ¶¶ 1-2, 6; Melbourne Aff. ¶¶ 1-2, 4.) In the course and scope of their duties, BSO Bomb Squad officers are regularly called upon to make an assessment of the risk of an explosive device being present, and are regularly required to decide whether probable cause and exigent circumstances exist, such that would require an immediate warrantless search of a place, container, building or vehicle, based on the possible threat to public safety. (Melbourne Aff. ¶ 1.)

On the day in question, the BSO Bomb Squad was called by Sergeant Rafael Masferrer of the MPD and asked to assist the MPD and the FBI in the search of a suspicious vehicle in garage number three at Northeast Second Street and Northeast Second Avenue. Cornetta received that call. (Cornetta Aff. ¶ 5; BSO Response to Interrogatories # 11, attached to DE 201-7.) That vehicle, a 1991 Nissan pickup truck, belonged to Lippman. (TAC ¶ 32.) Lippman had been traveling from North Carolina to Miami to cover the FTAA demonstrations, forums and educational events as a freelance reporter. (Lippman Decl. ¶ 2.)

When Cornetta and Melbourne arrived, the MPD personnel were already on the scene,

4

awaiting the arrival of the FBI Large Vehicle Bomb Unit.  Upon arrival, while standing outside

the parking garage, Cornetta and Melbourne were advised by Masferrer that Lippman's vehicle

had been under surveillance and that the driver had parked the vehicle, jumped out and ran away.

Masferrer also advised that a bomb-detection dog had shown interest in Lippman's vehicle.

(Cornetta Aff. ¶¶ 2-3, 7; Melbourne Aff. ¶¶ 5, 7.)  According to Cornetta, "that information, in

the context of the FTAA event, presented an exigent circumstance threatening public safety and

warranting an immediate search of the suspect vehicle.  The decision to search the vehicle had

been made by the time [he and Melbourne had] arrived on the scene, but [Cornetta] did not have

any reason to question that decision." (Cornetta Aff. ¶ 7.)  According to Melbourne, the bomb-

detection dog showing interest was "less than a full alert but still notable when considered with

the totality of the circumstances."  Based on his experience and the information provided to him,

"in the context of the high security environment of the FTAA event," there was "probable cause"

and an "exigent circumstance" to search the vehicle. The decision to search had been made by the

time Cornetta and Melbourne arrived but Melbourne also did not have any reason to question that

decision and believed it to be appropriate.  (Melbourne Aff. ¶ 7.)  Melbourne reported to

Cornetta and Cornetta reported to Masferrer. (BSO Resp. to Interrogatory # 12.)  Masferrer

requested that the BSO assist the FBI in approaching the vehicle and searching for explosives.

(Melbourne Aff. ¶ 9.)  The City of Miami was in command of the situation.(Cornetta Aff.¶ 10;

Melbourne Aff. ¶  13.)

    FBI personnel arrived, entered the building, and reportedly used a robot to search the

vehicle. Cornetta and Melbourne, however, did not personally observe that activity because they

were outside the building.  Masferrer requested that the BSO assist the FBI in approaching the

vehicle and searching for explosives. Cornetta assigned that task to Melbourne.  Melbourne put

on a protective bomb suit and entered the building to assist the FBI.  Cornetta remained outside

the building and did not observe Melbourne's search of Lippman's vehicle. (Cornetta Aff. ¶ 8;

Melbourne Aff. 8-9.)  Cornetta did not enter the parking lot where the vehicle was parked.  He

did not search the vehicle and he did not see the vehicle until the search was completed.  His

supervisory role was to respond to requests by the City of Miami and to provide Bomb Squad

assistance as deemed necessary.  The City of Miami law enforcement personnel were in

command of the situation, and the BSO was providing the requested assistance, relying on other

officers' probable cause determination.  However, Cornetta agreed with those officers that

probable cause and an exigency existed and that the search was appropriate based on the facts

presented to him.  (Cornetta Aff. ¶ ¶ 9-10.)

At the direction of Cornetta, Melbourne conducted the search for explosives, believing it

to be reasonable and lawful under the circumstances. (Melbourne Aff. ¶ 10.)  Melbourne put on a

protective bomb suit, weighing approximately 80 pounds, which can only be worn for a short

period of time, and entered the building to assist the FBI. (Melbourne Aff. ¶ 11.)  Melbourne

used a center punch tool to break the front windows in the vehicle, and searched its contents,

looking for explosive materials.  He found various personal property but no bombs or other

improvised explosive devices.  After completing the search, he announced the situation to be all

clear.  (TAC ¶ 40; BSO Am. Answer ¶ 40; Melbourne Aff. ¶ 12.)

Melbourne's role on that day was to respond to requests by the City of Miami and to

provide Bomb Squad assistance as deemed necessary.  The City of Miami law enforcement

personnel were in command of the situation, and the BSO was providing the requested

assistance, relying on other officers' probable cause and exigency determinations. Melbourne

did, however, agree with those officers that probable cause and exigent circumstances existed

and that a warrantless search was appropriate. (Melbourne Aff. ¶ 13.)  Neither Melbourne nor

Cornetta retained any of the personal property in the vehicle and they left the scene when

everything was completed. Everything was left under the command of the MPD. (Melbourne Aff.

¶ ¶ 14-15.)  On October 20, 2003, the United States District Court issued a press release which

provided in part:

> Miami Division facilities will be closed during this period because all three Federal
> courthouses in Miami are located within a primary security zone designated by the local law
> enforcement community for the FTAA meeting.  In the past, large-scale demonstrations
> prompted by meetings of similar organizations have resulted in serious incidents.  Law
> enforcement officials have advised the Court that such demonstrations may be anticipated
> in Downtown Miami during this meeting.  In the interest of public safety, the Court deems
> it prudent to close its Miami facilities so that Court staff and the general public need not
> travel to the areas within designated FTAA security zones.

(Press Release, Ex. 4, attached to DE 147.)

Facts relating to Defendant Rafael Masferrer

Prior to the FTAA event, on October 23, 2003, MDP personnel participated in the "Police

Call to Action" training program provided by the City of Miami Police Department.  This training

was required for all MPD personnel in all departments. (Masferrer Aff. ¶ 4.)  All MPD, BSO and FBI

Explosive Ordinance Disposal personnel received five weeks for Explosive Ordinance Disposal

Training at the FBI Hazardous Devices School.  The training included specific instruction for

officers on how to handle an explosive device situation, including how to assess probable cause and

how to deactive bombs. (Masferrer Aff. ¶ 5.)   Masferrer prepared protocols and operational plans

relating to the use of a bomb squad during the FTAA summit.  All bomb squad personnel from the

various agencies involved were briefed on the FTAA Bomb Detail Operational Plan. (Masferrer Aff.

¶ 7.)

Prior to the search of Plaintiff's vehicle, over thirty bomb threats were received by the MPD related to the FTAA summit, and within Masferrer's twelve hour shift, he received a total of twelve Explosive Ordinance Disposal ("EOD") response calls.  On average, only 12-14 EOD response calls are received in a given month.  According to Masferrer, "[t]he frequent bomb threats received within the short time period was irregular.  This pattern of bomb threats was consistent with acts of probing to observe how law enforcement agencies respond to bomb threats."[3] (Masferrer Aff. ¶ 10.)

Prior to November 19, 2003, Masferrer and the FBI entered into an agreement whereby the FBI headquarters' bomb response team, known as the FBI Bravo Response Team, was going to be "on call" in the event that a situation arose which required the team's specific expertise.  The FBI Bravo Response team had certain equipment and capabilities beyond those available to most bomb squads, including the City of Miami and Broward County bomb squads.  According to Masferrer, the FBI was the agency "most experienced with explosives" and therefore  "makes independent determinations of what to do in case of bomb threats." (Masferrer Aff. ¶ 6.)

An undercover member of an intelligence team, working closely with the FBI, contacted Masferrer.  Masferrer was informed that the FBI had followed a vehicle from a warehouse, where protestors were gathering, to the first floor of garage number three, where the vehicle was ultimately left. (Masferrer Aff. ¶ 12.)  Masferrer met the FBI surveillance team at garage number three and was

---

[3] The record does not differentiate between a "bomb threat" and an EOD response call. Masferrer states that he received a call regarding Lippman's vehicle and it was "the sixth call received on the morning of November 19, 2003."  However, there was no "bomb threat" from an unidentified source stating that Lippman's vehicle contained a bomb. Based on what is in the record, the only telephone call Masferrer received was from the FBI surveillance team informing Masferrer that they had been following Lippman.

briefed on the situation.  He learned that prior to his arrival a K-9 unit was deployed and showed an

interest in the vehicle.  In addition, he was told that the vehicle had been under surveillance and that

the driver had parked the vehicle, jumped out and ran away.  He was also advised that the driver of

the vehicle, upon leaving his vehicle in the garage, immediately solicited a taxi.  (Masferrer Aff. ¶

¶ 14-15.)  Plaintiff disputes that he jumped out of the vehicle and ran away and states instead that

"moved quickly" to hail a taxi in order that he could get to a particular FTAA panel discussion

scheduled to begin soon.[4] (Lippman Decl. ¶ 12.)

Masferrer contacted the FBI Response Team to assist in a "render safe" operation. (Battiste

Aff. ¶ 6.)  In situations where car bombs are suspected, bomb squad personnel are taught to perform

a "render safe operation" before doing anything further.  Render safe procedures require bomb squad

officers to determine whether a suspicious vehicle contains explosives and to neutralize the potential

---

[4] There is also a factual dispute regarding the presence of duct tape on Plaintiff's vehicle.
According to Patrol Officer Shane Maguffey, Plaintiff's pickup truck had duct tape around all the
windows and a pad lock on the door to the trunk.  Duct tape contains a chemical in the glue that
resembles the smell of an explosive substance.  The duct tape also prevents scents of gunpowder
and explosive residue from escaping the enclosed vehicle. Maguffey  had only seen vehicles
taped up in this manner in explosive detection training vehicles where the duct tape is used to
either seal the scent inside the vehicle or have the K-9 give a negative alert. (Maguffey Aff. ¶ ¶
10-11.)  Lippman disputes that there was duct tape around any of the windows of the vehicle.
(Lippman Decl. ¶ 11.)  The only evidence contained in the City of Miami and Masferrer's
statement of fact from the Maguffey's affidavit was that the K-9 unit had demonstrated an
interest in Lippman's vehicle prior to Masferrer's arrival. (DE 191 at ¶ 20 citing Maguffey Aff. ¶
¶ 8, 12.)  Maguffey's affidavit also states that according to his training, "any change in behavior
is an alert," although the affidavit does not state that he conveyed this information to any officers.
(Maguffey Aff. ¶ 12.)  To rebut the assertion that "any change in behavior is an alert," Plaintiff
submits Dr. I. Lehr Brisbin's affidavit. (DE 201-2.)  Although Masferrer argues that the Brisbin
affidavit should be excluded on procedural violations, the Court disagrees.  Plaintiff had no
reason to know that he would need the expert opinion of Dr. Brisbin until he was served with the
summary judgment motion that contained the Maguffey affidavit.  Plaintiff acted reasonably and
did not commit a procedural violation by filing the Brisbin affidavit in response to the summary
judgment motion.

danger to the public and other officers. (Masferrer Aff. ¶ 17.)  While at the scene, Masferrer set up the staging area outside the garage to ensure the safety of the public and officers. (Masferrer Aff. ¶ 20.)

According to Masferrer, the FBI Bravo Response Team personnel were informed of the situation and all related facts.  They were never explicitly instructed to search Plaintiff's vehicle. Given the FBI's greater expertise with bomb threats, the FBI Bomb Response Team made an independent determination of the appropriate actions based on the existing circumstances and known facts.  (Masferrer Aff. ¶ 18.)

Plaintiff disputes this point and states that Masferrer was in charge of the officers who participated in searching and seizing Plaintiff's vehicle and that he "made the decision to search the vehicle in conjunction with the FBI based on standard protocols when dealing with suspicious vehicles during EOD operations." (Pl. First Set of Interrogatories ¶¶ 12, 20, attached to DE 201-6.)

According to Masferrer, he only approached the vehicle once it was rendered safe by the FBI and BSO officers.  During the render safe operation, Masferrer states that he stood by the perimeter of the garage and could only see the vehicle from a distance.  Once the FBI Response Team arrived, they were the only ones who controlled the situation.  Masferrer asserts that he never searched the car or ordered the search.  (Masferrer Aff. ¶¶ 19, 21.)  During the process of rendering Plaintiff's car safe, the lock in the trunk of the vehicle broke.  According to Masferrer, Lippman's vehicle was towed to a storage location for its protection. (Masferrer Aff. ¶ 23.)  The MPD Incident Report states that the vehicle was towed to MPD for further investigation. (Romero's MPD Incident Report, Ex. 4, attached to DE 201.)

———

Facts Relating to the Individual FBI Defendants

In response to the City of Miami's request for assistance in preparing for the FTAA summit, the FBI provided a "headquarters bomb response team." The reason given to send the Bravo Response Team to Miami was that recent protests in other cities had resulted in violence and numerous incidents involving hazardous devices. The Bravo Response Team members sent to Miami included Jacques Battiste, Explosive Operations Specialist ("EOS"), Christian Hill, Explosive Test Operator ("ETO") and Darryl Tomlin, EOS (Battiste Aff. ¶ 4.)

The Bravo Response Team had certain equipment and capabilities beyond that available to most bomb squads, including the City of Miami and Broward County bomb squads.  In light of this fact, prior to November 19, 2003, Masferrer and Battiste discussed the fact that the Bravo Response Team was to be "on call" in the event that a situation arose which required the team's specific expertise.  The Bravo Response Team was not to be called in the event of an incident which could be readily handled by a local bomb squad, e.g., a call about a suspicious backpack left in a public area. Rather, Masferrer and Batiste agreed that the Bravo Response Team was only to be requested based upon a strong belief that a weapon of mass destruction or a large vehicle bomb had been discovered.  (Battiste Aff. ¶ 5.)

During the morning of November 19, 2003, Battiste's team monitored the local police nets and noted the number of calls for bomb squads.  According to Battiste, there were reports that protestors were becoming increasingly violent and confrontational with police throughout the security area and on the public streets leading up to the security perimeter.[5]  In addition, there were reports of sightings of at least one protest group that during previous protests was involved in violent

_____

[5] Plaintiff disputes this statement based on the lack of Battiste's personal knowledge.

activities that included using inflammatory devices. (Battiste Aff. ¶ 6.)

At approximately 10:39 a.m., Battiste received a request from Masferrer for the assistance of the FBI's bomb squad to deploy to a parking lot in Miami where a vehicle was located and to assist in a "render safe" operation. The local police were conducting an investigation to determine if the vehicle contained an explosive device considered a "large vehicle bomb." (Battiste Aff. ¶ 6.) Battiste, Tomlin and Hill arrived at a staging area about a block from the location of Lippman's vehicle, which was in a public parking garage. The staging area had been set up by Masferrer. The area surrounding the garage had been blocked off by local law enforcement officers, who were stopping pedestrian traffic and evacuating nearby areas. Local officers had been posted around the garage in the area of the vehicle. (Battiste Aff. ¶ 8.)

Masferrer, who was on the scene, provided a situation update and gave Battiste a description of the suspect vehicle and its location. According to Battiste, he was told "by a person believed to be a member of an FBI Intelligence Unit that the vehicle was driven by an individual with a criminal history related to protest activity, who had been under surveillance when he drove into the parking garage." This same person told Battiste that the driver of the vehicle "could have been providing assistance to the protestors" and "acted suspiciously" when leaving the vehicle. In addition, Masferer told Battiste that a K-9 unit had not alerted to the vehicle, but had demonstrated a strong interest in the back of the vehicle.[6] (Battiste Aff. ¶ 9.)

In light of the prior agreement with Masferrer that the Bravo Response Team would only be called out in the event of a strong belief that a weapon of mass destruction or a large vehicle bomb

_____

[6] The record also contains a report authored by Battiste stating "K-9 sweep clear." (DE 201-3.)

had been discovered, and in light of the information Battiste received at the scene from Masferrer and others, he believed that Masferrer had determined there was probable cause to believe that the vehicle contained a bomb and he had requested the Bravo Response Team to respond in order to carry out the render safe operation. Battiste treated the situation as an exigent circumstance. (Battiste Aff. ¶ 10.)

An FBI robot, equipped with several cameras to survey the vehicle, was then deployed.[7] However, when the robot was not able to provide an adequate view of the inside of the vehicle, Battiste chose Hill to be the down range operator. A down range operator is the bomb technician who approaches the location suspected to contain the bomb in order to determine if there is in fact a bomb and to take the necessary actions to render the bomb safe. (Battiste Aff. ¶ 11.)  Hill and Tomlin then performed a visual inspection of the vehicle.  Upon completion of the check, both withdrew to a staging area.  Hill and Tomlin had observed that the vehicle was a small pickup truck with an attached shell.  The rear of the camper was filled with numerous items, and Hill was unable to determine visually if the vehicle contained a bomb.  Hill believed that the space in the bed of the vehicle could have easily hidden a large explosive device.  According to Battiste, he then "considered the risks" and determined that the risk to public safety justified entry into the vehicle. (Battiste Aff. ¶ 12.)

Hill then donned a bomb suit and, along with the FBI robot, approached the vehicle. After he arrived at the vehicle, Hill cut the locks off the shell, cleared the rear tailgate of the vehicle, and opened the tailgate.  Hill then returned to the staging area. Then Tomlin used the robot to approach

---

[7] Both the FBI and Masferrer made the decision to deploy the FBI robot. (Battiste Aff. ¶ 13.)

the truck and remove the items from the rear of the truck.  As each item was removed, an attempt was made to identify if there was any type of improvised explosive device located in the items removed or in the rear of the vehicle.  Items such as sheets and clear plastic boxes, known to be safe, were placed in one area.  Other items that could not be visually cleared were placed in a separate area.  During the robot operation, a large piece of fabric from the vehicle became entangled in the robot's tracks.  With the fabric in the tracks, the robot could no longer move forwards or backwards, although the robot's camera and audio features remained operational.  Because the rear of the vehicle had not been completely cleared, Hill again donned the bomb suit and visually and manually cleared all the remaining items inside the rear of the vehicle.  Hill then cleared the items that had been removed and separated by the robot that could not be cleared previously.  Upon completion of this task, Hill returned to the staging area.  (Battiste Aff. ¶ 13.)

Based on the extreme heat and the fact that Hill had been in the hot and heavy bomb suit, Battiste then determined, for Hill's health, well-being and safety that Hill needed to be re-hydrated. The local bomb scene officers were briefed and the Bravo Response Team remained on the scene in case they were needed, but the FBI was not asked to provide any additional assistance with the vehicle.   Nor was any Bravo Response Team member involved in the decision to impound the vehicle.  (Battiste Aff. ¶ 15.)

Later that day, Lippman returned to the parking lot and saw his vehicle being towed away. After much difficultly, he finally took possession of his vehicle from the MPD.  Both passenger-cab windows were broken out, and in the back, where the camper top closes, both padlocks were broken off.  Inside the vehicle, all of Lippman's personal belongings were turned upside down, opened and scattered, the computer was outside of its case, files were dumped out in all directions, glass was all

14

over the seat, a flashlight and plastic drawers were broken and the gas cap was missing.  (Lippman Decl. ¶ 4.)   No bomb, contraband or any other illegal substance of material was ever found in Lippman's vehicle.  (MPD Special Investigations Section EOD Report, Prepared by Battiste, Ex. 3 attached to DE 201.)  No criminal or other charges were ever brought against Lippman. (Lippman Decl. ¶ 8.)

## II.  Summary of Defendants' Arguments

Defendant Masferrer moves for summary judgment on Plaintiff's section 1983 claims for violations of the First and Fourth Amendments.  With respect to the First Amendment claim, Masferrer argues that the undisputed facts show that he was not involved in the surveillance of Plaintiff and did not search his vehicle.[8]  Masferrer makes the following arguments regarding the Fourth Amendment claim: (1) he did not order or supervise the search; (2) the "bomb threat" constituted an exigent circumstance justifying a warrantless search; (3) arguable probable cause was established by the K-9 unit showing interest in the vehicle, Plaintiff's suspicious behavior and his status as a "known protestor w/history" and the unique circumstances of the FTAA summit and (4) the law is not clearly established that a bomb squad officer is individually liable for conducting a search for explosives when the officer did not physically participate in the search.

The City of Miami moves for summary judgment on the section 1983 claim for municipal liability and the state law claims for negligent search and seizure and trespass.  With respect to the

---

[8] Plaintiff's response to this argument is only that he needs to conduct further discovery before deciding whether to pursue his First Amendment claims against Masferrer. (DE 199 at 2 n.2.)  Based on this response, and given that Plaintiff's Fourth Amendment claim remains viable against this Defendant, the Court will grant summary judgment on the First Amendment claim. Plaintiff can seek to re-assert this claim should additional discovery give rise to facts supporting the First Amendment claim.

15

section 1983 claims, the City of Miami argues that Plaintiff has not established that his rights were violated and that there is no record evidence of a deficient municipal policy.  The City of Miami contends that sovereign immunity bars the state negligence and trespass claims.

Defendants Battiste, Hill and Tomlin move to dismiss, or in the alternative, for summary judgment, on Plaintiff's Fourth Amendment claim and move to dismiss Plaintiff's First Amendment retaliation claim.  With respect to summary judgment on the Fourth Amendment claim, the individual FBI defendants point to the following to establish arguable probable cause: (1) Battiste's agreement with Masferrer that the FBI Bravo Response Team would only be requested in the event of a strong belief that a weapon of mass destruction or large bomb had been discovered; (2) the fact that protests were occurring and becoming violent; (3) the driver had a "criminal history related to protest activity," been under surveillance, provided assistance to protestors and acted suspiciously, and the K-9 Unit had shown interest in the vehicle.  With respect to qualified immunity, the individual FBI defendants state that they reasonably concluded that a fellow officer determined that there was probable cause to search Plaintiff's vehicle. As to the First Amendment claim, the individual FBI defendants argue that this claim fails because they were not aware that the plaintiff was a journalist, and that the "chill" sustained by plaintiff is not an adverse effect of the retaliation.

Defendants Cornetta and Melborne move for summary judgment on the section 1983 claims for violation of Plaintiff's Fourth Amendment rights and the state law claims for negligent search and seizure and trespass.  According to these Defendants, summary judgment is appropriate on the Fourth Amendment claim because Cornetta never entered the parking garage, did not make a decision to search the vehicle or conduct the search, and Melbourne states that, in the context of the FTAA summit, the suspicious conduct of Plaintiff, the dog's interest in the vehicle and the request

by the MPD, arguable probable cause is satisfied.  These Defendants also argue that no clearly established law was violated because no bomb squad officer has ever been held individually liable for conducting a search for explosives when requested to do so by the FBI and another law enforcement agency.  Lastly, the Broward Sheriff's Office contends that state sovereign immunity bars the state negligence and trespass claim.

### III.  Summary Judgment Standard

The Court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party.  Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp., 477 U.S. at 323.  To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case.  Id. at 325.

After the movant has met its burden under Rule 56(c), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586

(1986).  According to the plain language of  Fed. R. Civ. P. 56(e), the non-moving party "may not rest upon the mere allegations or denials of the adverse party's pleadings," but instead must come forward with "specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 587.

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim.  Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."  Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted." Anderson, 477 U.S. 242, 249-50.

IV. Discussion

A.  Fourth Amendment Claims

Section 1983 provides individuals with a federal remedy for the deprivation of rights protected by the United States Constitution.  Von Stein v. Brescher, 904 F.2d 572, 578 (11th Cir. 1990).  With respect to a person's Fourth Amendment rights, law enforcement officials must obtain a warrant supported by probable cause in most circumstances, unless there is consent, to justify a search.  United States v. Magluta, 418 F.3d 1166, 1182 (11th Cir. 2005).  "A warrantless search is allowed, however, where both probable cause and exigent circumstances exist." United States v. Tobin, 923 F.2d 1506, 1510 (11th Cir.1991).  Exigent circumstances arise when "the inevitable delay incident to obtaining a warrant must give way to an urgent need for immediate action." United States v. Satterfield, 743 F.2d 827, 844 (11th Cir.1984) (citing United States v. Burgos, 720 F.2d 1520 (11th

18

Cir.1983) (emphasis in the original)). Examples of recognized exigent circumstances include: (1) danger of flight or escape; (2) danger of harm to police officers or the general public; (3) risk of destruction of evidence and (4) hot pursuit of a fleeing suspect. United States v. Santa, 236 F.3d 662, 669 (11th Cir. 2000).

"[Q]ualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." Oliver v. Fiorino, 586 F.3d 898, 904 (11th Cir.2009) (quoting McCullough v. Antolini, 559 F.3d 1201, 1205 (11th Cir.2009). Qualified immunity protects officers acting within the scope of their discretionary authority at the time of the incident. McCullough, 559 F.3d at 1205. The Supreme Court has established a two-part test for determining whether government officials are entitled to qualified immunity, and the district court has discretion to determine in what order to address each part. Pearson, 129 S.Ct. 808, 818 (2009). The plaintiff must prove that (1) the government official violated his or her constitutional or statutory rights and (2) that those rights were clearly established at the time the official acted. Douglas Asphalt Co. v. Qore, Inc., 541 F.3d 1269, 1273 (11th Cir. 2008).

To determine whether qualified immunity exists, "the issue is not probable cause in fact but arguable probable cause." Rushing v. Parker, 599 F.3d 1263, 1266 (11th Cir. 2010). A defendant is therefore protected by qualified immunity once he or she can demonstrate the existence of arguable probable cause. Id. Arguable probable cause exists when reasonable officers in the same circumstances and possessing the same knowledge as the defendant could have believed that probable cause existed. Id. quoting Case v. Eslinger, 555 F.3d 1317, 1327 (11th Cir. 2009); Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997).

1.  Constitutional Violation

The Court finds that there was not arguable probable cause to search Plaintiff's vehicle nor was there an emergency justifying searching the vehicle without a warrant.  The various factors pointed to by Defendants do not constitute a circumstance by which reasonable law enforcement officers could have believed that probable cause existed.  The Court will discuss each of these factors in turn, however, even these factors taken together would not establish arguable probable cause.

*Safety concerns surrounding FTAA conference*

The record evidence demonstrates that law enforcement officials had significant safety concerns about the arrival of protestors in Miami in association with the FTAA conference.  There is also record evidence that the police received an increase in telephone calls regarding either bomb threats or calls requiring a response from EOD on the days of the FTAA conference.  There is, however, no evidence linking Plaintiff to any violent protest activity.  Nor is there any evidence demonstrating that Plaintiff had connections to any of the groups who were engaging in protest activity at the FTAA conference that day.  Most significantly, there is no evidence in the record of a bomb threat associated with Plaintiff or his vehicle.  Cf.  United States v. Williams, 626 F.2d 697 (9th Cir. 1980) (exigent circumstances to justify search of car when bomb had been used in bank robbery less than 15 minutes before and officer saw suspect who fit broadcast description of robber in automobile).  At most, the evidence showed that Plaintiff parked his vehicle in an area in close proximity to the protest area.  Of course, numerous vehicles would have been parked in a city garage conveniently located near the conference.  See Olaniyi v. District of Columbia, 416 F. Supp. 2d 43, 60 (D.D.C. 2006) (law enforcement officials were not entitled to qualified immunity from warrantless search of van belonging to artist detained at United States Capitol Building on suspicion

of possession of explosives, even though van was parked two blocks from Senate office building, once no explosives were found on the plaintiff's person and canine inspection produced negative results). The Court finds, as a matter of law, that the mere fact that the FTAA conference posed safety concerns for law enforcement officials did not provide arguable probable cause to conduct a search of Plaintiff's vehicle. See Bourgeois v. Peters, 387 F.3d 1303, 1311 (11th Cir. 2004) ("[t]he text of the Fourth Amendment contains no exception for large gatherings of people.")

> *Plaintiff had "criminal history related to protest activity," was under surveillance and provided assistance to protestors*

As a matter of law, these facts do not give rise to the conclusion that Plaintiff's vehicle contained a bomb and therefore an exigency existed allowing a warrantless search. Although the record demonstrates that Plaintiff was being surveilled from North Carolina to Miami for his criminal[9] history related to protesting, noticeably absent is any indication as to why the FBI followed Plaintiff. Defendants point to no evidence that Plaintiff had a history of making bombs and bringing them to protest sites. Nor do Defendants provide any description of the nature of the assistance Plaintiff provided to protestors or how this "assistance" raised an inference that a bomb was in Plaintiff's vehicle. In other words, without knowing facts about the criminal history and the reason for the surveillance, the Court is hard-pressed to give any weight to these factors. Moreover, to the extent that Masferrer was told that Plaintiff had a "history related to protest activity," it would have been more reasonable to assume this history stemmed from a legitimate exercise of his First Amendment rights, and not bomb making. See Estep v. Dallas County, 310 F.3d 353, 358 (5th Cir. 2002) ("A police officer's inference that danger is afoot because a citizen displays an NRA sticker

---

[9] Masferrer only knew that Plaintiff had a "known history" relating to protesting whereas Battiste testified that Plaintiff had a "criminal history" relating to protesting.

in his vehicle presents disturbing First and Fourth Amendment implications.")

*Plaintiff's suspicious behavior*

Taking the facts in the light most favorable to Plaintiff, the record demonstrates that, upon arriving in the garage, Plaintiff moved quickly to hail a taxi in order to attend a FTAA panel discussion that was scheduled to begin soon. Defendants also noted that Plaintiff chose to park in a garage where numerous police vehicles were parked. These particular facts do not, as a matter of law, create an exigent circumstance or provide arguable probable cause to believe the vehicle contained a bomb. The Eleventh Circuit addressed the exigent circumstance of danger to human life and the need to protect the public in United States v. Holloway, 290 F.3d 1331 (11th Cir. 2001). In that case, a 911 caller reported hearing gunshots and an argument emanating from the suspect's home. Id. at 1332-33. Upon arrival, the police spotted a shotgun and several shell casings on the porch, and decided to enter the residence to check for victims and weapons. Id. at 1333. In upholding the warrantless search, the Holloway Court held that "emergency situations involving endangerment to life fall squarely within the exigent circumstances exception." Id. at 1337. In so finding, the Court noted that the police act constitutionally when they reasonably believe an emergency exists that calls for an "immediate response to protect the public from imminent danger." Id. Clearly, Plaintiff's behavior, quickly exiting his vehicle, does not rise to the level of exigent circumstances as recognized in the Holloway case.

*K-9 Unit showing interest in the vehicle*

As a matter of law, the Court finds that it is not reasonable for an officer to conclude that a K-9 unit showing interest in a vehicle is equivalent to an alert by a trained dog. To begin, the caselaw holds that an alert is the trained response by a dog when confronted with the presence of the

target odor, whereas an interest is a lesser behavior change. See United States v. Jacobs, 986 F.2d 1231, 1235 (8th Cir. 1993); United States v. Johnson, 323 F.3d 566, 567 (7th Cir. 2003) citing Sandy Bryson, Police Dog Tactics 257 (2d ed. 2000). Indeed, an alert by a trained dog establishes the necessary probable cause to conduct a search. See Merritt v. Moore, 58 F.3d 1547, 1551 n.7 (11th Cir. 1995) ("an alert by a narcotics trained dog establishes probable cause to believe a car contains illegal narcotics."); United States v. Banks, 3 F.3d 399, 402 (11th Cir. 1993) ("probable cause arises when a drug-trained canine alerts to drugs"). On the other hand, the mere fact of a dog showing interest does not constitute probable cause. Jacobs, 986 F.2d at 1235; United States v. Guzman, 75 F.3d 1090, 1096 (6th Cir. 1996). Therefore, arguable probable cause would not be established by a dog showing interest in a vehicle.[10] In light of these conclusions, the question presented is whether a bomb detection dog showing interest in a vehicle, taken in conjunction with other factors, can establish arguable probable cause.

In United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008), the United States Court of Appeals for the Tenth Circuit addressed whether the police had probable cause to arrest a defendant at a bus station. In that case, the narcotics dog responded to an odor change, but did not give a full alert. Id. at 1144. The Court did find, however, that the behavior change was one factor that should be considered in the totality of circumstances. Id. at 1146. The defendant in Munoz-Nava wore a suspicious pair of heavy boots, which contained a bulge, fresh glue on the inner soles, fresh black

---

[10] Alternatively, the conflicting affidavits of Maguffey and Brisbin create a question of fact as to whether it is reasonable for an officer to believe that showing interest is equivalent to an alert. Notably, Maguffey's affidavit does not state that he reported to any officer involved in the search his belief that showing interest is equivalent to an alert. Furthermore, there is also a question of fact regarding the knowledge Battiste had at the time. Although Battiste's affidavit states that he was told the K-9 unit demonstrated a strong interest in the vehicle, his report stated that the K-9 sweep was "clear."

dressing on the bottom of the boots, and the boots were the size and brand containing false compartments previously seized by law enforcement.  In addition, the defendant stated that he used the boots for "exercise" and possessed an additional pair of these boots. Finally, the defendant, who was traveling, did not have any luggage. The lack of luggage and the wearing of boots was similar in "pattern to other  individuals apprehended . . . with narcotics in footwear." Id. at 1444.

Here, the facts are not as compelling as the facts in Munoz-Nava.  In Munoz-Nava, even putting aside the dog's behavior,  the defendant was traveling without luggage and he engaged in highly suspicious behavior by wearing boots with a bulge that could contain narcotics and were identical to those previously seized by law enforcement.  Thus, the law enforcement officers in Munoz-Nava had  identifiable information suggesting that the boots contained narcotics prior to the use of the narcotic-sniffing dog.  Furthermore, these facts all concerned actions taken by the defendant (i.e., wearing of boots, not carrying luggage, dubious excuse for boots).  In the instant case, Defendants point to several factors, including protest activity surrounding the FTAA,  a history of violence at similar protests, reports of violence at the protests and numerous calls requiring police inquiry and bomb threats, as additional factors for the Court to consider in finding arguable probable cause.  There is no record evidence, however, to connect Plaintiff with any of these factors, other than Plaintiff's tenuous connection as a known protestor with a criminal history.  These factors do not raise any reasonable inference to conclude that a bomb was inside Plaintiff's vehicle.

*Fellow Officer Rule*

All of the Defendants seek to use the fellow officer rule as a shield to protect them from civil liability.  In Florida, the fellow officer rule "allows an arresting officer to assume probable cause to arrest a suspect from information supplied by other officers." Voorhees v. State, 699 So. 2d 602,

609 (Fla. 1997).  "The collective knowledge of police investigating a crime is imputed to each member under a rule of law called the 'fellow officer rule' or 'collective knowledge rule.'" Johnson v. State, 660 So. 2d 648, 657 (Fla. 1995); see also Whiteley v. Warden, 401 U.S. 560, 568 (1971) (fellow officer rule allows probable cause to be imputed from one officer to another).  In Delgado v. Miami-Dade County, 456 F. Supp. 2d 1234 (S.D. Fla. 2006), a reporter was arrested along with a group of FTAA protestors and brought suit against the individual officer who signed, but did not write, the arrest affidavit.  The Court found that the police officer's reliance on the information supplied by his fellow officers was legitimate, noting that the officer "relied on the contemporaneous observations and descriptions by fellow officers of Plaintiff's actions, delivered to him after the fact." Furthermore, the circumstances of the arrest gave rise to arguable probable cause.  Id. at 1239. Clearly, then, the fellow officer rule does not convert the mere conveyance of information by one officer to another into probable cause.[11]

The facts of this case are distinguishable from Delgado.  In Delgado, the arrest was supported by arguable probable cause, a finding not made here.  Even assuming Defendants could rely on this doctrine, there are numerous factual issues that preclude summary judgment on this point. Essentially, Defendants each disclaim responsibility for the search and contend that another Defendant was responsible for the decision to search the vehicle.  (Battiste Aff. ¶ ¶ 5, 10, 13; Cornetta Aff. ¶ ¶ 9-10; Masferrer Aff. ¶ ¶ 6, 18-19, 21; Melbourne Aff. ¶ 13.)  Clearly, this is the type of factual dispute - a decision as to who was responsible for the search - which cannot be

---

[11]    Moreover, this doctrine also differs from the circumstance where "a subordinate is following the seemingly reasonable orders of a supervisor."  Even in those cases, "officers would be held liable in [section 1983] cases if there is a reason why any of them should question the validity of that order." O'Rourke v. Hayes, 378 F.3d 1201, 1210 n.5 (11th Cir. 2004).

resolved on a motion for summary judgment.  At the same time, Defendants each claim they made

their own independent determination in deciding to search the vehicle. (Battiste Aff. ¶ 12; Cornetta

Aff. ¶¶ 7, 9-10; Melbourne Aff. ¶¶ 7, 13; Pl. First Set of Interrog. ¶¶ 12, 20, attached to DE 201-6.)

If that is the case, the fellow officer rule does not apply.  Of course, on this record, it is unclear

whether Defendants are claiming another defendant was responsible for the decision to search the

vehicle or that they each made their own independent determination.  That, too, is a factual dispute

that cannot be resolved at this stage.

### *Summary*

In sum, the majority of the factors highlighted by the officers, alone or in conjunction with

the others, do not support a finding either of exigency or arguable probable cause as a matter of law.

To the extent the officers rely on the fellow officer rule, there is a question of fact that cannot be

resolved on summary judgment.

### 2.  Clearly Established

Because the Court has found, at the summary judgment stage, that Defendants violated

Plaintiff's Fourth Amendment rights, the next step is to determine whether, at the time of the search,

it was clearly established that a search made without arguable probable cause  violates the Fourth

Amendment's prohibition on unreasonable searches and seizures.  See Skop v. City of Atlanta, 485

F.3d 1130, 1143 (11th Cir. 2007) (formulating the Fourth Amendment clearly established question).[12]

Under the facts presented, binding precedent clearly established that a warrantless search of an

automobile would have only been  permitted  where both probable cause and exigent circumstances

---

[12] Based on Skop's formulation of the clearly established question, the Court rejects the
formulation of the clearly established question presented by Defendants.

existed.  Tobin, 923 F.2d at 1510; see United States v. Alexander, 835 F.2d 1406, 1408 (11th Cir.

1988) (same).  Given that the Court has not found, as a matter of law, that  an exigency or arguable

probable cause existed, it was clearly established that searching Plaintiff's vehicle was a violation

of the Fourth Amendment.

### B.  First Amendment Claim with respect to FBI Individually Named Defendants

The FBI Individually Named Defendants move to dismiss, or alternatively for summary

judgment, on the First Amendment retaliation claim.  To state a First Amendment retaliation claim,

the United States Court of Appeals for the Eleventh Circuit has stated that a plaintiff "must establish

first, that his speech or act was constitutionally protected; second, that the defendant's retaliatory

conduct adversely affected the protected speech; and third, that there is a causal connection between

the retaliatory actions and the adverse effect on speech." Bennett v. Hendrix, 423 F.3d 1247, 1250

(11th Cir. 2005).

According to the FBI Individually Named Defendants, this claim fails because these

Defendants were not aware that Plaintiff was a journalist and Plaintiff has failed to meet his burden

of demonstrating that the FBI search of his vehicle would "deter a person of ordinary firmness from

exercising his or her First Amendment rights." (DE 135 at 18-19 and citing Bennett, 423 F.3d at

1252.)

Rule 8(a) of the Federal Rules of Civil Procedure requires "a short and plain statement of the

claims" that "will give the defendant fair notice of what the plaintiff's claim is and the ground upon

which it rests." Fed. R. Civ. P. 8(a). The Supreme Court has held that "[w]hile a complaint attacked

by a Rule 12(b) (6) motion to dismiss does not need detailed factual allegations, a plaintiff's

obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and

conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (internal citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." <u>Ashcroft v. Iqbal</u>, 129 S. Ct. 1937, 1949 (2009) (quotations and citations omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Thus, "only a complaint that states a plausible claim for relief survives a motion to dismiss." <u>Id.</u> at 1950. When considering a motion to dismiss, the Court must accept all of the plaintiff's allegations as true in determining whether a plaintiff has stated a claim for which relief could be granted. <u>Hishon v. King & Spalding</u>, 467 U.S. 69, 73 (1984).

With respect to the argument that Defendants were not aware that Plaintiff was a journalist, Plaintiff has pled that he was a "protestor w/history." The facts, as pled in the Third Amended Complaint, and which the Court must accept as true, demonstrate that this was one of the reasons the decision was made to search Plaintiff's vehicle. (TAC ¶¶ 36, 36B, 45, 114.) Thus, this is not a grounds for dismissal.

The Court also rejects Defendants' argument that the alleged "chill is not an adverse effect" as required under <u>Bennett</u>. (DE 135 at 19.) <u>Bennett</u> states that "[a] plaintiff suffers adverse action if the defendant's allegedly retaliatory conduct would likely deter a person of ordinary firmness from the exercise of First Amendment rights." <u>Bennett</u>, 423 F.3d at 1254. Here, Plaintiff has alleged that he has been chilled in the exercise of his First Amendment rights; he exercises caution and reservation before attending and participating in political demonstrations, worries about his vehicle,

and fears he will be surveilled and subjected to searches and seizures.  In addition, he was unable to do his work as a freelance reporter regarding the FTAA demonstrations. (TAC ¶¶ 39, 45.)  At the pleading stage, Plaintiff has met the standard articulated in Bennett.  Id. at 1255 citing Garcia v. City of Trenton, 348 F.3d 726, 729 (8th Cir. 2003) ("[w]e note that the question is not whether the plaintiff [ ] was deterred, though how plaintiff acted might be evidence of what a reasonable person would have done.")

For the foregoing reasons, the Court denies the Individual FBI Defendants' Motion to Dismiss the First Amendment claim.

C.  Municipal Liability of the City of Miami under Section 1983

In moving for summary judgment on the section 1983 claim for municipal liability, the City of Miami argues that it cannot be held liable because there is no record evidence of a deficient municipal policy or that the policy was the result of deficient indifference or that the policy was the "moving force" behind the alleged violation.[13]  (DE 190 at 5.)  In response, Plaintiff states that summary judgment is premature because Plaintiff has not had the opportunity to complete discovery. In fact, Plaintiff identifies numerous items of discovery necessary to respond adequately and fully to the motion, including complete information on all bomb squad incidents that occurred during the FTAA summit, information about bomb squad practices standard for determining whether a search is to be conducted, explosive ordinance training materials, training materials specific to the FTAA summit, and information as to the agreement between Miami and the FBI. (DE 200 at 6-9.)

_____

[13]  The City of Miami also argues that Plaintiff has not established that his rights were violated.  Given that the Court has determined, as a matter of law, that a constitutional violation occurred, the Court need not address this argument.

In ruling on summary judgment motions, the Eleventh Circuit has held that "summary judgment may only be decided upon an adequate record." WSB-TV v. Lee, 842 F.2d 1266, 1269 (11th Cir.1988). "If documents or other discovery sought would be relevant to the issues presented by the motion for summary judgment, the opposing party should be allowed the opportunity to utilize the discovery process to gain access to the requested materials. Snook v. Trust Co. of Georgia Bank of Savannah, N.A., 859 F.2d 865, 870 (11th Cir. 1988). Here, as noted supra, Plaintiff has identified numerous items it requires to oppose the motion for summary judgment. Furthermore, while the City of Miami relies heavily on the affidavit of Masferrer, Plaintiff has not been afforded the opportunity to conduct his deposition. It would be improper to rule on the motion without allowing Plaintiff this opportunity. See Jones v. City of Columbus, 120 F.3d 248, 253 (11th Cir. 1997) (finding district court abused its discretion in deciding summary judgment when the plaintiffs never had opportunity to examine all the documents they requested or to depose the city officials whose affidavits were offered in support of the motion for summary judgment); Luberisse v. V & V Sons, Inc., No. 07-81064-CIV, 2008 WL 4820071, at *1 (S.D. Fla. 2008) (finding the plaintiff's request for discovery reasonable when the plaintiff has been unable to take depositions of individuals relied upon in the moving party's motion for summary judgment).

For this reason, the City of Miami's motion for summary judgment with respect to the section 1983 claim for municipal liability is denied without prejudice. This motion may be renewed after adequate discovery has been completed.

D. Application of State Sovereign Immunity to the State Law Claims

Both the City of Miami and the Broward Sheriff's Office move for summary judgment on the claims brought by Plaintiff for negligence and trespass to chattels, claiming that sovereign

immunity bars these claims.[14]  Plaintiff disagrees and argues that neither the public duty exception nor the discretionary function exception to the waiver of sovereign immunity applies.

With respect to governmental tort liability, the state of Florida has "waived sovereign immunity from liability in tort actions for any act for which a private person under similar circumstances would be held liable." Pollock v. Florida Dept. of Highway Patrol, 882 So. 2d 928, 932 (Fla. 2004) citing Henderson v. Bowden, 737 So. 2d 532, 534-35 (Fla. 1999) (internal quotation marks omitted); Moore v. State, Florida Fish and Wild Conservation Comn, 861 So. 2d 1251, 1253 (Fla. Dist. Ct. App. 2003); see Florida Statute § 768.28.  "There can be no governmental liability unless a common law or statutory duty of care existed," and "if no duty of care is owed with respect to the alleged negligent conduct, then there is no governmental liability, and the question of whether the sovereign should be immune from suit need not be reached." Pollock, 882 So. 2d at 932.

With respect to the public duty exception to the statutory waiver of sovereign immunity, a plaintiff must demonstrate that the government entity owed a duty of care to the plaintiff individually rather than to the public in general. Miami-Dade County v. Fente, 949 So. 2d 1101, 1103 (Fla. Dist. Ct. App. 2007).   There is no "common law duty of care owed to an individual with respect to the discretionary judgmental power granted to a police officer to make an arrest and to enforce the law." Everton v. Willard, 468 So. 2d 936, 938 (Fla. 1985).

The parties do not disagree that Plaintiff must demonstrate the government entity owed a duty of care to the plaintiff individually, rather than to the public as a whole.  (DE 146 at 16; DE 152-2

---

[14] Given that the Court finds that sovereign immunity bars these claims, the Court need not address Defendants' arguments that the negligence claim is not properly pled and that probable cause and exigent circumstances are a defense to a claim for trespass.  Likewise, the Court does not need to address the City of Miami's claim that it is not liable to Plaintiff because Masferrer did not search Plaintiff's vehicle.

at 24; DE 190 at 14; DE 200 at 16.)  Plaintiff, however, states  that a special tort duty arises when

law enforcement officers place people within a "zone of risk" by taking people into police custody,

detaining them or subjecting them to danger. (DE 152-2 at 25 and DE 200 at 16 citing Kaisner v.

Kolb, 543 So. 2d 732, 736 (Fla. 1989))  While true,  pivotal to the application of the "zone of risk"

doctrine is the law enforcement officer's decision to "assume control over a particular situation or

individual or group of individuals accompanied by a corresponding duty to exercise reasonable care."

Pollack, 882 So. 2d at 935; Kaisner, 543 So. 2d 736 (officer had duty to protect detained motorist

from oncoming traffic); Brown v. Miami-Dade County, 837 So. 2d 414, 418 (Fla. Dist. Ct. App.

2001) (officer conducting sting operation had duty to exercise reasonable care to avoid harm to

bystanders).  Significantly, Plaintiff does not contend that he was placed in danger by Defendants

as a result of the search and seizure of his vehicle and personal belongings.  Instead, he makes the

novel argument, without any citation to caselaw, that the holding of Kaisner should be extended to

property in addition to people.

The Court finds that there is no basis to deviate from the general rule that there is no common

duty of care owed to an individual with respect to the powers granted to police officers when

engaging in their law enforcement duties, especially when Plaintiff has provided no authority for

extending Kaisner to include a duty of care to inanimate objects.  Absent a legal duty owed to

Plaintiff, sovereign immunity bars the tort claims.  Accordingly, the Court need not address the

discretionary function exception.[15]

---

[15] The Court does note, however, that the parties' dispute on this point surrounds the
application of the discretionary function exception in a perceived emergency situation.
Defendants claim that this doctrine applies to a decision by police officers to conduct a search
during a perceived emergency situation, whereas Plaintiff contends that because there was no
emergency, the discretionary function exception cannot apply.  When it comes to the application

V.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** as follows:

1)    Individual Federal Defendants' Motion to Dismiss or in the Alternative for Summary Judgment (DE 135) is **DENIED**.

2)    Broward Sheriff's Office Defendants' Motion for Summary Judgment on Counts IV, V, and VIII of Plaintiff's Second Amended Complaint (DE 146) is **GRANTED IN PART AND DENIED IN PART**.

3)    Defendant Rafael Masferrer's Motion for Summary Judgment on Count VII of Plaintiff's Second Amended Complaint (DE 189) is **GRANTED IN PART AND DENIED IN PART**.

4)    The City of Miami's Motion for Summary Judgment on Counts I, II, III of Plaintiff's Second Amended Complaint (DE 190) is **DENIED WITHOUT PREJUDICE IN PART AND GRANTED IN PART.**

5)    Plaintiff's Post-Hearing Motion to Lift Stay of Discovery for Specific Purposes (DE 219) is **GRANTED.**

6)    Plaintiff's Motion for Case Management Conference (DE 262) is **GRANTED.**  A

---

of Florida sovereign immunity law, it appears that resolution of this dispute is immaterial. Indeed, "courts have primarily taken the view that the fundamental police function in enforcing the criminal law would be unduly hampered if law enforcement decisions were generally subject to after-the-fact judicial review through private tort litigation." Fente, 949 So. 2d at 1104; see Miami-Dade County v. Miller, 19 So. 3d 1037, 1042 (Fla. Dist. Ct. App. 2009) (same).

forthcoming order will set a date for the conference.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 19th day of July, 2010.

_____
KENNETH A. MARRA
United States District Judge